SKC

WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Brandon and Ashely Phillips,

Plaintiffs,

v.

Lake Havasu City, et al.,

Defendants.

No.   CV 20-08131-PCT-JAT (JZB)

**ORDER**

Plaintiffs Brandon and Ashely Phillips, husband and wife, brought this civil rights action through counsel against Lake Havasu City and Lake Havasu City Police Department Officers Kloewer, Smith, Kirk, and Sautner pursuant to 42 U.S.C. § 1983 and Arizona state law.  Defendants move for summary judgment.  (Doc. 34.)  The Motion is fully briefed. (Doc. 39, 41).

The Court will grant in part and deny in part the Motion for Summary Judgment.

## I.    Background

This action arises from an April 26, 2019 incident at the Lake Havasu Nautical Beachfront Resort in which Defendants Kloewer, Smith, Kirk, and Sautner responded to a dispute that ensued when the occupants of a large orange boat parked their boat in one of Plaintiffs' reserved parking spots while Plaintiffs' boating party was out, and when Plaintiffs' party returned, refused to move their boat and became rude and hostile, prompting the resort Manager to call the police.  (Doc. 1-1 ¶¶ 17−24.)  Plaintiffs allege that, during a confrontation in which the occupants of the orange boat were the aggressors,

Defendant Officers placed Plaintiff Brandon Phillips and Brandon's brother-in-law under arrest; told Brandon he was under arrest for "trespassing," even though Brandon had paid for the boat parking spaces and had rented a room at the resort; struck and kicked Brandon, knocking him to the ground and causing him serious knee injuries; then forced Brandon to walk and denied him medical attention while Ashely Phillips witnessed the assault and tried to alert the officers to Brandon's injuries.  (*Id.* ¶¶ 25−42.)

In their Complaint, Plaintiff's bring the following six claims: Count One, Fourth and Fourteenth Amendment excessive use of force; Count Two, Fourth and Fourteenth Amendment wrongful arrest; Count Three, state law battery; Count Four, state law negligent infliction of emotional distress; Count Five, state law assault; and Count Six, state law loss of consortium.  (*Id.* at 9−15.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

1   it must "come forward with specific facts showing that there is a genuine issue for trial."

2   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

3   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

4       At summary judgment, the judge's function is not to weigh the evidence and

5   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

6   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

7   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

8   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

9   **III.   Facts**

10      **A.   Defendants' Failure to Produce Admissible Evidence**

11      As an initial matter, Defendants rely almost entirely on wholesale citations to an

12  exhibit containing 29 pages of unsigned, unsworn police reports, together with portions of

13  body-worn camera (BWC) evidence, to set forth the relevant facts.  (*See* Doc. 35 (Defs.'

14  Separate Statement of Facts (DSOF)).)  Plaintiffs properly object to Defendants' reliance

15  on the police reports on the ground that the statements therein are inadmissible hearsay

16  from unidentified individuals, but they do not dispute many of the asserted facts or object

17  to their use for purposes of the summary judgment motion only.  (*See, e.g.*, Doc. 40 at 2−4

18  (Pls.' Statement of Controverting Facts (PSOCF)) ¶¶ 1−3.)).

19      For ease of understanding the sequence of events underlying Plaintiffs' claims, the

20  Court will rely on Defendants' facts based on the generally-cited police reports to set forth

21  explanatory, non-material facts that are readily identifiable in those reports.[1]  Where the

---

[1] In addition to the admissibility issues, Defendants' blanket citations to entire exhibits and lengthy segments of BWC footage to support their facts are insufficiently specific to carry their burden on summary judgment.  *See* Fed. R. Civ. P. 56(c)(3); *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) ("[g]eneral references without page or line numbers are not sufficiently specific").  In its discretion, the Court has nonetheless relied on its own review of the video evidence, together with other admissible evidence, to determine the relevant, supported facts.  Where the Court could not easily ascertain the source of Defendants' asserted facts, however, the Court deems those facts unsupported and has not included them.  *See Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002) (internal quotation omitted) ("Judges need not paw over the files without assistance from the parties."); *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

asserted facts are material to Plaintiffs' claims, however, the Court will rely only on available sworn testimony, such as Plaintiff Brandon Phillips's affidavit testimony, or direct video evidence to set forth the relevant facts.  As always at the summary judgment stage, where there are genuine disputes of material fact, the Court will take Plaintiffs' supported version of the disputed facts as true and draw all reasonable inferences in Plaintiffs' favor.  *Anderson*, 477 U.S. at 249, at 255.

### B.    Arrest Incident

On April 26, 2019, at approximately 7:07 p.m., Lake Havasu City Police Officers Kirk and Smith were in the cove area of the Nautical Resort; the beach was full of boats, and large groups of people were gathered near boat parking space No. 1.  (DSOF ¶ 1.)  The groups appeared to be associated with two different boats parked near that space, and the officers noted that the two groups were engaged in a verbal altercation that began to escalate when someone threw a beverage, and the subjects began getting into each other's faces and yelling.  (*Id.*)  The officers attempted to separate the groups to prevent a physical altercation from taking place.  (*Id.*)

Resort security was present to assist with the dispute, and several more patrol officers arrived, and the groups were separated.  (*Id.* ¶ 2; Doc. 35-1 at 5 ("Reporting Officer Narrative").)  A man whose shirt appeared to be wet from the thrown drink was detained due to his "aggressive behavior" and unknown involvement in the incident.  (*Id.*)  The officers handcuffed the man, later identified as Kyle Fantin, and Fantin pointed out a man with blue shorts and a black hat whom he said had thrown a beer in his face.  (DSOF ¶ 6; Doc. 40-1, Ex. 2 (Axon II BWC Footage ("BWC 2") at 00:41−1:53).)  One of the officers spoke to the man Fantin identified, and the suspect, later identified as Arev Norhadian, denied throwing a beer at Fantin.  (Axon 2 at 3:00−3:23.)  At least one other witness, Nicholas, told the officer he saw Norhadian throw a beer straight at Fantin's face.  (*Id.* at 11:00−11:58.)  Two of the officers arrested Norhadian, placed him in handcuffs, and escorted him from the beach, along a cement walkway, and into a patrol car parked along a circular roadway at the front of the resort.  (*Id.* at 13:00−15:53.)

While this was going on, unidentified officers also made contact with Plaintiff Brandon Phillips, who explained that the conflict was over which boat was entitled to occupy space No. 1.  (DSOF ¶ 3.)  Brandon explained the process for reserving a boat space and complained that a large orange boat had parked in space No. 1 without prior reservation, which Brandon stated he believed had been permitted by the resort security due to the boat owner being friends with resort management, and the occupants of the orange boat were keeping the rightful occupants from being able to park their boat in that space.  (*Id.*)  After conversing with Brandon, the officers asked Brandon to wait around while they investigated the matter, and Brandon continued to wait while the Officers conducted their investigation.  (Doc. 40 at 1−4 (PCSOF) ¶ 4; *id.* at 4−7 (Pls.' Separate Statement of Facts (PSSOF)) ¶ 11.)

Later, Sergeant Sautner[2] approached Brandon and asked him to leave, and Brandon asked, "For what? For what? What did I do?"  (PSSOF ¶ 12; Doc. 40-1, Ex. 2 (Axon II BWC Footage ("BWC 3")) at 1:53−56.)  While Brandon was asking this, Sautner said, "Hey!" and grabbed Brandon's arm and twisted it behind Brandon's back and said, "Now you're going to jail!" (BWC 3 at 1:56−59.)  Brandon again asked, "For what?" while being handcuffed behind his back, and Sautner yelled, "trespassing!"  (*Id.* at 1:59−2:01.)  Brandon said, "I asked what I did!" to which Sautner yelled back, "I asked you to leave, and you didn't leave."  (*Id.* at 2:01−10.)

During this time, Sgt. Sautner handcuffed Brandon behind his back with the assistance of two other officers, one on each side of Brandon, with Sautner pulling Brandon's hands together, while Brandon asked, while smiling, "Are you kidding me right now?"  (*Id.*)  The officer to Brandon's right, Officer Kloewer, yelled, "stop tensing up, man!" while Sautner applied the cuffs behind Brandon's back, and the officer to Brandon's left said, "relax, relax."  (*Id.* at 2:10−12.)  Kloewer, said, "You're going to end up getting hurt, boy.  You're going to get real hurt."  (*Id.* at 2:12−15.)  The officers then started

---

[2] Plaintiff identifies the officer as Defendant Smith, but Defendants identify him as Sergeant Sautner.  (PSSOF ¶ 5; DSOF ¶ 9.)  For purposes of this Motion, the Court will adopt Defendants' identifications of the officers seen on video.

1   walking forward, with Brandon's hands pulled together behind his back and Kloewer
2   maintaining a hold on Brandon's right forearm.  (*Id.* at 2:15−26.)

3           While Brandon was being escorted, Brandon's wife, Plaintiff Ashely Phillips, asked
4   Brandon what was going on, and Brandon said, "I asked him what I did, and he turned into
5   a little bitch."  (PSSOF ¶ 18.)  Right then, Officer Kloewer struck Brandon in the back of
6   the neck and kicked the side of Brandon's leg out, knocking Brandon to the ground.  (*Id.*
7   ¶ 19; BWC 3 at 2:26−28.)  Kloewer and another officer rolled Brandon onto his side in the
8   sand, and Kloewer yelled, "You done?"  (BWC 3 at 2:28−33.)  Brandon replied, "Yup,"
9   while Kloewer held the side of Brandon's head down in the sand, and Kloewer repeated,
10  "You done?" and Brandon said, "What did I do?"  (*Id.* at 2:33−35.)

11          Officer Kloewer and Corporal Francis pulled Brandon back up to his feet, and
12  Brandon continued to repeat, "Tell me what I did," while the officers continued to walk
13  Brandon toward a series of concrete steps leading from the cove area to the front of the
14  resort.  (*Id.* at 2:35−48.)  As they approached the first set of steps, Kloewer yelled, "Stop
15  fighting, man.  You're gonna end up getting real f - - - ing hurt."  (*Id.* at 2:48−56.)  At this
16  time, Ashley can be heard off-camera saying, "he has a hurt knee," and Brandon then says,
17  "I got a bad knee, Bro."  (*Id.*)

18          At this point, one of the officers can be heard on video yelling, "stop hitting me!"
19  and, according to Defendants, Ashley began hitting Officer Kloewer, and non-Defendant
20  Officer VanPelt responded to control Ashely, but these actions are not visible on the video
21  or supported by any direct testimony.  (*Id.* at 2:57.)  The officers continued to escort
22  Brandon, with Brandon limping slightly up three separate sets of concrete steps.  (*Id.* at
23  2:57−3:05.)

24          A few seconds later, Brandon stopped walking and said, "my knee, my knee,
25  please!"  (*Id.* at 3:19.)  The officers stopped momentarily, then the officer to Brandon's left
26  told Brandon something like, "When we get to the car, we'll fix it, but you need to walk."
27  (*Id.* at 3:20.)  After a few more steps, Brandon stooped down and said to the officer on his
28  left, "my knee, my left foot," and then turned to Officer Kloewer behind him, and said,

"Dude, you got to give me a [indistinct]" and then, turning back to the officer on his left, "Can I please . . ." and Kloewer, stated, "This all could have been avoided if you'd just left when you were told to." (*Id.* at 3:20−29.)  Brandon then turned his body back toward Kloewer, saying "all I did was ask what I did!" and Kloewer pushed Brandon's shoulder and said, "stop turning around on me, man!" (*Id.* at 3:30−34.)  While continuing to limp forward, Brandon asked if he could sit on the wall, and Kloewer responded, "we're gonna go sit in this car right here." (*Id.* at 3:35−39.)  Brandon said he needed a paramedic, and Kloewer said, "OK, we'll talk about that right over here," and Brandon sat down on the walkway and said "No, I need an ambulance." (*Id.* at 3:39−3:49.)

For the next several seconds, Brandon sat or laid on the ground, saying he needed paramedics, and Ashley joined the conversation, saying Brandon was limping and his knee hurt. (*Id.* at 3:49−4:06.)  Brandon stated he had a "bad knee," and when asked what he meant by this, Brandon explained that the officers had hurt his knee when they threw him on the ground. (*Id.*)  Ashley insisted that Brandon told the officers his knee hurt *before* they threw him down, and Kloewer said Brandon had been audio- and video-recorded "since we been here" and had never told the officers that he had a bad a knee before being thrown down. (*Id.* at 4:06−22.)

After this argument, the officers pulled Brandon back up and walked him through a patio area to a waiting SUV patrol car.  While walking across the patio, Brandon pointed to a set of outdoor chairs and asked if he could sit in "that chair right here" and again stated he needed an ambulance. (*Id.* at 4:22−5:00.)  Once at the patrol car, Brandon asked "can you please loosen the left cuff."  Officer Kloewer agreed to loosen the left cuff and then forgot to do so before placing Brandon in the patrol car; he then had to have Brandon step back out of the car so he could loosen the cuff. (*Id.* at 5:00−5:46.)  During this time, Brandon and at least two other individuals off camera, including Ashley, objected to what was going on and asked why Brandon was being taken to jail, and Kloewer argued with Brandon, insisting that Brandon had not listened to the officers, while Brandon replied, "I listened to everything you said, man." (*Id.* at 5:46−6:30.)  At Brandon's request, the

officers gave Ashely Brandon's wallet, and while Brandon and Kloewer continued to argue, the officers placed Brandon back in the patrol vehicle, and Ashely repeatedly said, over the arguing, "Brandon just go.  Brandon, go."  (*Id.*)

At no time during this incident did Brandon resist arrest, pull away, or try to escape.  (PSSOF ¶ 20.)  Due to Officer Kloewer's conduct, Brandon sustained knee injuries.  (*Id.* ¶ 26.)  He subsequently had to undergo two separate surgeries for a meniscus tear and receive extensive physical therapy.  (*Id.*)[3]

## IV.   Count One: Fourth Amendment Excessive-Use-of-Force

### A.   Legal Standards

#### 1   Fourth Amendment[4]

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests."  *Id.*

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the

_____

[3] Plaintiffs assert that Brandon's injuries included "a pivot shift bone marrow contusion and impaction injuries, . . . a complete tear of his ACL, grade 1 proximal MCL injury, and a complex tear of his meniscus which necessitated two separate surgeries and extensive physical therapy."  (PSSOF ¶ 26.)  In support, Plaintiffs cite only to Brandon's affidavit.  Although Brandon can testify from personal knowledge that he suffered knee injuries due to being thrown to the ground and that he later required surgeries and extensive physical therapy for an ACL tear, absent any medical records or medical opinion evidence, Brandon's lay affidavit is insufficient to demonstrate any specific knee injuries or to causally connect these injuries, including his ACL tear and need for surgeries and physical therapy, to Kloewer's use of force.

[4] Plaintiffs bring their excessive-use-of-force claim under both the Fourth and Fourteenth Amendment, which is duplicative and incorrect.  "The law of this circuit continues to be that in actions for the unconstitutional seizure of persons by officials, liability will be determined under the specific standards of the Fourth Amendment rather than under the general due process standards of the Fourteenth Amendment."  *Larson v. Neimi*, 9 F.3d 1397, 1402 (9th Cir. 1993), s*uperseded by rule on other grounds* as stated in *C.B. v. Cty of Sonora*, 769 F.3d 1005, 1016 (9th Cir. 2014).

governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary.  *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396−97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances."  *Espinosa*, 598 F.3d at 537.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968)).  This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396−97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law."  *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).  But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force.  *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).  Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."  *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury

1  to sift through disputed factual contentions, and to draw inferences therefrom") (quotation
2  omitted).

3      Where video evidence is available, the court "should [] view[] the facts in the light
4  depicted by the videotape." *Scott*, 550 U.S at 380−81.  This does not mean, however, that
5  courts no longer take the nonmovant's version of the facts as true where video evidence,
6  seen in a light most favorable to the nonmoving party, leaves room for genuine dispute.
7  Courts must still draw all reasonable inferences in the nonmovant's favor. *Williams v. Las*
8  *Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D.
9  Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of
10  summary judgment: in general, the court will draw all reasonable inferences from the video
11  in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir.
12  2007)).

### 2.    Qualified Immunity

14      Government officials enjoy qualified immunity from civil damages unless their
15  conduct violates "clearly established statutory or constitutional rights of which a reasonable
16  person would have known." *Harlow v. Fitzgerald* , 457 U.S. 800, 818 (1982).  In deciding
17  if qualified immunity applies, the Court must determine: (1) whether the facts alleged show
18  the defendant' s conduct violated a constitutional right; and (2) whether that right was
19  clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S. 223, 230-
20  32, 235-36 (2009) (courts may address either prong first depending on the circumstances
21  in the particular case).

22      Whether a right was clearly established must be determined "in light of the specific
23  context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201
24  (2001).  The plaintiff has the burden to show that the right was clearly established at the
25  time of the alleged violation.  *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero*
26  *v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).  Thus, "the contours of the right must
27  be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable
28  official would understand that what he is doing violates that right;" and "in the light of pre-

existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted).  Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful.  *Romero*, 931 F.2d at 627.

### B.    Discussion

#### 1.    Defendants Kirk and Smith

Defendants argue that Defendants Kirk and Smith should be dismissed because there is no evidence these Defendants used any force on Brandon.  (Doc. 34 at 11.) Plaintiffs do not address this argument in their Reply.  Nor do Plaintiffs point to any evidence in their Statement of Facts pertaining directly to Officers Kirk and Smith that would create a genuine issue of material fact that these officers were present during, involved in, or aware of Brandon's arrest or Officers Sautner and Kloewer's uses of force at the time.[5]  Because there is no evidence upon which a reasonable jury could find that these officers violated Plaintiffs' constitutional rights, the Court will dismiss Defendants Kirk and Smith from this action.

#### 2.    Handcuffing

Defendants argue that Defendant Sautner is entitled to summary judgment based on handcuffing Brandon, arguing only in summary fashion that the "application of handcuffs

---

[5] Without specifically mentioning Defendants Smith and Kirk, Plaintiffs attempt to add a failure-to-intervene claim in their Response, arguing that an officer's duty to intervene in another officer's excessive use of force is clearly established.  (Doc. 39 at 12.) While true, to prevail on a failure-to-intervene claim, a plaintiff must show that the officer had a "realistic opportunity" to intervene and prevent a constitutional violation from taking place.  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000); *see also Galloway v. Cnty. of Los Angeles*, 2012 WL 3887060, at *6 (C.D. Cal. Aug. 15, 2012), *report and recommendation adopted*, 2012 WL 3887058 (C.D. Cal. Sept. 7, 2012) (a plaintiff must allege that the officers "provide[d] some affirmative physical support at the scene of the violation *and* when they [were] aware of the plan to commit the violation (or ha[d] reason to know of such a plan), [they did] not object.")  Plaintiffs merely made collective allegations against all Defendants in their Complaint, and except to misidentify Sgt. Sautner as Officer Smith in their Statement of Facts, have not now identified Officers Smith and Kirk or pointed to any evidence that these officers participated in, were aware of, or had any realistic opportunity to intervene in any alleged constitutional violations.

1   on someone for whom there is probable cause for a trespass arrest cannot reasonably be
2   considered excessive force, or force prohibited by clearly established law." (*Id.*)

3       Defendants do not cite to any caselaw to support this proposition. Moreover, even
4   if Defendant Sautner had probable cause to arrest Brandon for trespassing, this does not
5   preclude the use-of-force analysis. The Supreme Court has recognized that the "the
6   imposition of correctly applied handcuffs on [an individual], who was already being
7   lawfully detained . . . [i]s undoubtedly a separate intrusion." *Muehler v. Mena*, 544 U.S.
8   93, 99 (2005); *see also Edward Lu, Plaintiff, V. County of Riverside, Saun D. Jackson,*
9   *Defendants.*, No. EDCV201062CBMSHKX, 2022 WL 2815929, at *5 (C.D. Cal. July 7,
10  2022) (citing *Muehler* and finding that handcuffing during a lawful detention can constitute
11  an actionable use of force even when the handcuffs are not applied incorrectly or too tight);
12  *cf. United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (noting in the *Terry* stop
13  context that "handcuffing substantially aggravates the intrusiveness of an otherwise routine
14  investigatory detention").

15      Based on the video evidence, Defendant Sautner walked up to Brandon and another
16  man in a white T-shirt standing by themselves toward the side of the cove and said to
17  Brandon, "You're outa here." (BWC 3 at 1:50−1:52.) Brandon stepped closer to Sautner
18  and asked, "What? For what?" and, "What did I do?" (*Id.* at 1:52−1:58.) Brandon then
19  turned his body outward to face another officer who had accompanied Sautner, bringing
20  his right arm and shoulder next to Sautner, and Sautner said "Hey!" and immediately
21  grabbed Brandon's right arm and twisted it behind his back, and yelled, "Now you're going
22  to jail!" and pulled Brandon's hands together behind his back and started placing Brandon
23  in handcuffs. (*Id.* at 1:57−2:00.)

24      The nature of the force Defendant Sautner used consisted of grabbing Brandon by
25  the arm and shoulder, pulling Brandon's arms together, and handcuffing Brandon behind
26  his back while verbally telling him, "Now, you're going to jail!" These actions constituted
27  a modest use of force. Whether such force was reasonable in relation to the governmental
28  interests at stake at that time requires assessing such factors as the severity of the crime,

the threat posed by Brandon, and whether Brandon was resisting arrest.  *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396−97.

Defendants do not discuss any of these factors; based on the video evidence, however, Defendant Sautner identified Brandon's crime as "trespassing."  Under Arizona law, "a person commits criminal trespass in the third degree" by "[k]nowingly . . . remaining unlawfully on any real property after a reasonable request to leave by a law enforcement officer . . .").  *See* Ariz. Rev. Stat. § 13-1502(A)(1).  Under the facts presented, there are questions of fact whether Sautner's demand that Brandon leave was "reasonable" and whether the few seconds during which Brandon asked why he was being asked to leave constituted "remaining unlawfully on [the] property."  Regardless, criminal trespass in the third degree is a class 3 misdemeanor, meaning, at the time Sautner handcuffed him, Brandon was suspected of only a minor, non-violent offense.

There is also no evidence Brandon was posing a threat to the officers or anyone else on the scene at the time.  According to his declaration testimony, Brandon was told to wait while the officers investigated his complaint about the individuals on the orange boat, and he waited for the officers to conduct their investigation.  Based on the video evidence, when Sautner subsequently approached him and ordered him to leave, Brandon was peacefully standing off to the side of the cove with one other individual and was not yelling, fighting, or involved in any disturbance on the beach.  As to whether he was resisting the officers, Brandon asked why he was being told to leave, but he did not physically resist the officers prior to Sautner grabbing him and placing him in handcuffs.  There was, therefore, only minimal, if any, need for Sautner to use force against Brandon under the circumstances confronting the officers at that time.

The final question—whether the force used was reasonably necessary—favors Plaintiffs and weighs against this use of force.  It is clear from the video evidence that Brandon was not posing a threat at the time of this encounter, and there is no evidence he had previously posed a threat, been asked to leave, or done anything except wait for the officers to conduct their investigation.  Defendant Sautner's actions of suddenly grabbing

1    and handcuffing him in the few seconds Brandon asked why he was being told to leave

2    were therefore not reasonably related to any immediate need for force, and Defendants

3    have failed to make an initial showing that this use of force was objectively reasonable

4    under the circumstances.

5            Even if Defendants could produce competent evidence that Defendant Sautner had

6    reason to believe Brandon had been involved in the earlier disturbance or had previously

7    been asked to leave the property and had refused to do so—potentially changing the use-

8    of-force analysis—there would, at a minimum, still be genuine issues of material fact

9    whether Sautner's actions constituted a constitutional violation.  Brandon stated in his

10   declaration that, when first contacted by the officers on the beach, he merely explained

11   what started the conflict involving the occupants of the orange boat and then waited, as

12   instructed, while the officers investigated the situation.  (*See* B. Phillips Decl. ¶¶ 11−16.)

13   Apart from asking why he was being asked to leave and what he had done wrong, he also

14   never resisted the officers.  (*Id.* ¶ 20.)  Taking Brandon's sworn account of the facts as true

15   and drawing all reasonable inferences in Plaintiffs' favor, Sautner's actions of then

16   grabbing Brandon, placing him in handcuffs, and shouting "now you are going to jail!"

17   were not reasonably related to any need for force at the time.  Because there are, at a

18   minimum, genuine issues of material fact whether Defendant Sautner's use of force was

19   objectively reasonable under the circumstances, Sautner is not entitled to summary

20   judgment on the ground that he did not violate Brandon's Fourth Amendment rights.

21           Defendants do not make any separate qualified immunity argument beyond their

22   conclusory statement that Defendant Sautner's actions were "neither excessive, nor

23   violative of clearly established law."  (Doc. 34 at 11.)  To the extent they seek to assert

24   qualified immunity on the second prong—that Sautner did not violate any clearly

25   established rights of which a reasonable officer would have known—Defendants fail to

26   identify the right at issue.  Considering the specific context of the case, *Saucier*, 533 U.S.

27   at 201, the right at issue here is the right of a peaceful bystander to a disturbance, who is

28   not posing a threat, to be free from seizure and handcuffing when verbally questioning

police upon being ordered to leave.  The plaintiff has the burden to show that the right was clearly established at the time; however, Defendants did not argue this right was not clearly established, and Plaintiffs did not address the handcuffing in their Response.

The Court nonetheless finds that Defendant Sautner is not entitled to qualified immunity on the facts presented.  It is undisputed that grabbing Brandon by the shoulder and arms, handcuffing him, and telling him he was "going to jail" was a seizure and therefore constituted a warrantless arrest, which must be supported by probable cause that Brandon had committed or was committing a crime.  *See Dunaway v. New York*, 442 U.S. 200, 214 (1979) (except for a few recognized exceptions, the required analysis for whether an arrest is constitutional "has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause").[6]

As noted, Brandon did not refuse to leave upon Sautner's request but only questioned why he was being asked to leave and what he had done wrong, and Sautner responded almost immediately by grabbing him and saying, "now you're going to jail."  It is firmly established that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22–27 (1968)).  But whether a reasonable officer would have had probable cause to arrest Brandon for trespassing in the few seconds between Defendant Sautner asking Brandon to leave and Brandon's arrest, purportedly based on refusing a reasonable order from police to leave the property, Ariz. Rev. Stat. § 13-1502(A)(1), presents a factual issue upon which a reasonable jury could find in Plaintiffs' favor.  Because a reasonable jury could find that Brandon was not refusing to comply with police orders, there is a question of fact whether seizing Brandon and placing

---

[6] Although the Supreme Court has long recognized that handcuffing and other forms of seizure in the context of a brief, investigatory stop may be justified on less than probable cause, *see Terry v. Ohio*, 392 U.S. 1 (1968), Defendants do not argue, and there is no evidence to support, that Defendant Sautner handcuffed Brandon during a brief, investigatory stop.  Rather, the evidence shows that Sautner applied handcuffs to Plaintiff while expressly arresting him for trespassing and telling him he would "go to jail."

him in handcuffs at that time violated clearly established law holding that such actions are unlawful unless based on probable cause, and Sautner is not entitled to qualified immunity.

### 3.    Take Down Maneuver

Defendants argue that Defendant Kloewer's "take down on a sandy beach [w]as neither excessive, nor violative of clearly established law." (Doc. 34 at 11.)

As to the nature of the force, Defendants acknowledge that a takedown maneuver is an "intrusive, physical technique[]." (*Id.* at 12.) Courts have found forceful takedowns of subjects while handcuffed behind the back "substantial" and "aggressive," *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021), and, where serious injury results, "quite severe." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). On the other hand, the Ninth Circuit has also described the use of a leg-sweep maneuver to trip a subject and take him to the ground in a controlled fashion a "modest deployment of force." *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021). Accounting for Brandon's claimed knee pain resulting from being forcefully taken to the ground, and construing the facts in Plaintiffs' favor, the takedown employed by Defendant Kloewer was at least a modest to intermediate level of force.

As to the government interests at stake, the analysis here is substantially the same as that above. With respect to the nature of the crime, trespassing under the circumstances herein presented is only a non-violent, misdemeanor offense. Brandon was also not posing a danger to the officers or others when Defendant Kloewer suddenly struck him in the back of the neck and threw him to the ground. Instead, by this time, Brandon was handcuffed with both arms pulled behind his back and was being escorted by at least two officers. Although Brandon verbally complained about the arresting officer, explaining to Ashley, "I asked him what I did, and he turned into a little bitch," Brandon did not threaten the officers or make any attempt to harm anyone.

As to whether he was resisting the officers, Defendants argue that Brandon "was involved in continuing resistance, culminating in him pulling his arms downward and away in an attempt to free himself from Officer Kloewer's control." (Doc. 34 at 11.) In support,

Defendants rely solely on the video footage, arguing that this evidence clearly shows that "Officer Kloewer followed [Brandon's] momentum from pulling his arms downward, with [Brandon] was taken (sic) to the ground on the sandy beach." (*Id.* at 12.)

Contrary to Defendants' arguments, Brandon's purported resistance by pulling his arms downward is not clearly seen on the video; nor have Defendants provided any firsthand accounts from Defendant Kloewer or anyone else with personal knowledge to support these assertions. Under these circumstances, the Court must construe the facts in light of the video, and where the video is unclear, construe the disputed facts in favor of the non-moving party. The Court therefore takes as true that Brandon did not resist Kloewer's control over him.

Based on these facts, there was simply no need for Defendant Kloewer to strike Brandon on the back of the neck and throw him to ground, making these actions excessive in relation to the need for force at the time. Defendants have therefore failed to meet their initial burden of showing that Defendant Kloewer did not violate Brandon's constitutional rights.

Defendants' qualified immunity argument also fails because it depends on resolving the disputed facts in Defendants' favor, which the Court cannot do on summary judgment. Defendants argue that "[a] wealth of cases [place] law enforcement on notice that intrusive, physical techniques may be reasonably used where a suspect is uncooperative or his actions, including failure to comply with commands, raises a reasonable possibility of flight." (Doc. 34 at 12 (citing cases).) Here, however, the evidence does not show that Brandon was uncooperative or failed to comply with the commands of any of the officers when Officer Kloewer threw him to the ground. And it is firmly established in this Circuit that the sudden use of a take-down maneuver on a non-resisting or passively resisting suspect, even in the case of a more serious offense, constitutes an excessive use of force. *See Santos*, 287 F.3d at 854–55 (forcefully taking down burglary suspect who did not fully comply with all commands but was not actively resistant was excessive); *see also Meredith*

*v. Erath*, 342 F.3d 1057, 1060 (9th Cir. 2003) (grabbing and throwing down a suspect in a tax investigation who was merely verbally combative was excessive).

Even if Defendants could produce admissible evidence that Brandon at some point lowered his arms in an attempt to resist Kloewer's control over him, Brandon's sworn testimony that he never resisted or tried to escape is sufficient to create a genuine issue of material fact whether Brandon did anything to justify Kloewer's takedown.  Kloewer is therefore not entitled to qualified immunity.  *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.")  The Court will deny summary judgement to Defendant Kloewer based on his take down of Brandon.

## V.     Count Two: False Arrest

### A.     Legal Standard

To prevail on a Fourth Amendment false arrest claim, a plaintiff must be able to show that there was no probable cause for the arrest.  *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (citation omitted).  Probable cause exists when an officer has reasonably trustworthy information of facts and circumstances that are sufficient to justify the belief that an offense has been or is being committed.  *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009) (citing *Brinegar v. United States*, 338 U.S. 160, 175−76 (1949) (internal quotation marks omitted)).  "Probable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes.  *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008).  When determining whether probable cause exists, the Court looks to the totality of the circumstances known to the arresting officer at the time of the arrest.  *Id.* (internal quotation marks and citation omitted).  "In applying these standards, [the Court] must consider all the facts known to the officers and consider all the reasonable inferences that could be drawn by them before the arrest."  *United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir. 1975).  Where any

potential crime is supported by probable cause, the arrest is justified.  *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 952 (9th Cir. 2003), *overruled on other grounds by Edgerly v. City & Cnty. of San Francisco,* 599 F.3d 946, 956 n. 14 (9th Cir.2010); *Barry v. Fowler*, 902 F.2d 770, 773, n.5 (9th Cir. 1990); *Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008).

"An officer who makes an arrest without probable cause, however, may still be entitled to qualified immunity if he reasonably *believed* there to have been probable cause. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (emphasis in original). The two prongs of the qualified immunity analysis in this context are "(1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree" that the information known to the officer at the time did not amount to probable cause.  *Id.* (emphasis in original).

### B.    Discussion

Defendants' entire argument regarding Plaintiffs' false arrest claim is that "[t]o the extent Sautner and/or Kloewer are deemed to be involved in the arrest of [Brandon], it was based on probable cause, or arguable probable cause, for trespass, resisting arrest, and/or disorderly conduct."  (Doc. 34 at 14.)  Defendants do not discuss the elements of any of these crimes or point to any information known to Defendants Sautner and Kloewer at the time of Brandon's arrest that would have given a reasonable officer probable cause to believe Brandon had committed or was committing any of these offenses.

As noted above, the only available evidence regarding why Brandon was arrested comes from the video evidence, which shows that Defendant Sautner grabbed and began handcuffing Brandon while Brandon was asking what he did and why he was being told to leave, and Sautner then yelled, "trespassing!"  For the reasons already discussed with respect to the use of force, whether a reasonable officer could have concluded that Brandon was refusing a reasonable request by police to leave in the few seconds that Brandon asked why he was being asked to do so before Sautner grabbed and handcuffed him is a question

of fact for a jury to decide.  Likewise, absent any argument from Defendants regarding the elements of any underlying offense or why a reasonable officer in Sautner's and/or Kloewer's position could have believed that Brandon was committing a crime, Defendants have failed to make a colorable qualified immunity defense.[7]   The Court will deny summary judgment to Defendants Sautner and Kloewer on Plaintiffs' false arrest claim.[8]

## IV.     State Law Claims

### A.     Assault and Battery (Defendant Kloewer)

Under Arizona law, "[t]o establish a battery claim, a plaintiff must prove that the defendant intentionally caused a harmful or offensive contact with the plaintiff to occur. *Johnson v. Pankratz*, 196 Ariz. 621, 623, 2 P.3d 1266, 1268 (Ariz. Ct. App. 2000). "Similarly, a claim for common-law assault requires an allegation that the defendant acted intentionally to cause a harmful or offensive contact and another person is placed in imminent apprehension of the contact.  *Gallegos v. Flores*, No. 1 CA-CV 10-0178, 2012 WL 208858, at *3 (Ariz. Ct. App. Jan. 24, 2012).  Both claims are intentional torts, but assault does not require the offensive touching or contact.  *Id.*

Law enforcement officers are shielded from liability for using physical force during an arrest when the arrestee uses or threatens physical force, and the following conditions are all met:

---

[7] For the first time in their Reply, Defendants cite to Arizona statutes for trespassing and resisting arrest and offer some argument as to how the video evidence shows Brandon violated these statutes. (Doc. 41 at 7−8.) Because Defendants did not refer to these statutes or make any such arguments in their Motion, these arguments are waived. *See Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009) (per curiam) (the court will not consider arguments raised for the first time in a reply brief); *United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006) (recognizing the general principle that arguments raised for the first time in a reply brief are waived); *Martinez-Serrano v. INS* , 94 F.3d 1256, 1259 (9th Cir. 1996) (arguments raised for first time in reply brief are not considered).  Nonetheless, even considering these arguments, Defendants merely rely on disputed facts—including that Brandon resisted arrest by initially moving his arm away to prevent handcuffing or moved his arms in a downward motion while being escorted—which are not clear from the video or supported by any competent evidence and which, at most, create questions of fact for a jury to decide.

[8] Defendants also argue that Plaintiffs cannot support a *Monell* claim against Lake Havasu City (Doc. 34 at 14−15), but Plaintiffs clarify in their Response that they are not asserting a *Monell* claim (Doc. 39 at 15), so the Court will not address this argument.

1. A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.

2. Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.

3. A reasonable person would believe the arrest or detention to be lawful.

Ariz. Rev. Stat. § 13-409.

Defendants argue that Defendant Kloewer is entitled to summary judgment on Plaintiffs' assault and battery claims based on his use of force when striking Brandon on the back, tripping him, and taking him to ground because Brandon was resisting arrest "through the use or threatened use of force," and "the police conduct here was within official duties, was reasonable, and, therefore, justification must be applied." (Doc. 34 at 16−17.)  Once again, these arguments rely on construing disputed facts in Defendants' favor.  At a minimum, there are genuine issues of material fact whether Brandon "use[d] or threaten[ed] physical force" when Kloewer threw him to the ground and whether a reasonable person would have believed the force was necessary.

Because these are questions of fact for a jury to decide, the Court will deny summary judgment to Defendant Kloewer on Plaintiffs' Assault and Battery claims in Counts Three and Five.

### B.    Negligent Infliction of Emotional Distress

To bring a claim for negligent infliction of emotional distress (NIED) under Arizona law, a Plaintiff must "witness an injury to a closely related person, suffer mental anguish manifested as physical injury, and be within the zone of danger." *Kaufman v. Langhofer*, 222 P.3d 272, 279 (Ariz. Ct. App. 2009).

Plaintiffs' NIED claim is based on Plaintiff Ashely Phillip's alleged emotional distress from watching her husband Brandon "be assaulted and battered by Defendant Kloewer," be arrested, and suffer excruciating pain while being escorted to the police

vehicle.  (Doc. 1-1 ¶¶ 80−82.)  Plaintiffs also bring a respondeat superior claim against Lake Havasu City based on Kloewer's alleged tortious conduct. (*Id.* ¶ 84.)  Plaintiffs allege that, as a result of these actions, Brandon suffered physical injury, and "both Plaintiffs suffer, and continue to suffer, anxiety, insomnia, mental anguish, distress, embarrassment, humiliation, and damages in an amount to be proven at trial." (*Id.* ¶ 85.)

Defendants argue that they are entitled to summary judgment on Plaintiffs' NIED claim because the record does not show that Ashley was in the "zone of danger" when Brandon was taken down on the beach or that she suffered mental aguish "so severe as to manifest itself into a physical injury." (Doc. 34 at 17.)

In their Response, Plaintiffs do not point to any evidence upon which a reasonable jury could infer that Ashley was ever in the "zone of danger" during Brandon's arrest and takedown on the beach or at any other time during Brandon's escort to the patrol car.  They also have not identified or produced any evidence that the mental anguish Ashley allegedly suffered manifested itself as physical injury.  Plaintiffs did not produce an affidavit or any direct testimony from Ashley concerning her distress or injuries; nor have they produced any medical evidence regarding either Plaintiffs' alleged injuries.  Absent a showing on the zone of danger and physical injury prongs, Plaintiffs' NIED claim fails as a matter of law, and the Court will grant summary judgement to Defendants Kloewer and Lake Havasu City on this claim.

### C.   Loss of Consortium

Plaintiffs' loss of consortium claim is based on Ashley Phillips' alleged loss of her husband Brandon's "love, companionship, affection, society, moral support, and solace" due to the injuries Brandon suffered as a result of his alleged assault and battery. (Doc. 1-1 ¶¶ 96−97.)

Loss of consortium is a derivative claim, meaning "all elements of the underlying cause must be proven before the claim can exist." *Barnes v. Outlaw*, 964 P.2d 484, 487 (1998).  Defendants have not separately argued they are entitled to summary judgement on Plaintiffs' loss of consortium claim.  Moreover, because the Court will deny summary

judgement to Defendants on Plaintiffs' assault and battery claims against Defendant Kloewer, the loss of consortium claim does not fail as a matter of law.  To the extent Defendants intended to seek summary judgment on this claim on the grounds that no underlying claims remain, summary judgment is denied.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 34).

(2)     Defendants' Motion for Summary Judgment (Doc. 34) is **granted in part** as to the following claims:

(a)     Plaintiffs' Fourth Amendment excessive-use-of-force and false arrest claims against Defendants Smith and Kirk in Counts One and Two; and

(b)     Plaintiff's Negligent Infliction of Emotional Distress claim against Defendants Kloewer and Lake Havasu City in Count Four.

(3)     The Motion is otherwise **denied**.

(4)     Defendants Smith, Kirk, and Lake Havasu City are **dismissed** with prejudice.

(5)     The **remaining claims** in this action are Plaintiff's Fourth Amendment excessive-use-of-force and false arrest claims against Defendants Sautner and Kloewer in Counts One and Two and their state-law assault, battery, and loss of consortium claims against Defendant Kloewer in Counts Three, Five, and Six.

(6)     This action is referred by random lot to Magistrate Judge Eileen S. Willett for the purpose of conducting a settlement conference.

(7)     The parties must jointly contact the chambers of Magistrate Judge Willett at (602) 322-7620 within 14 days of the date of this Order to schedule a settlement conference.

Dated this 21st day of September, 2022.

James A. Teilborg
Senior United States District Judge